UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JAMES K.,[1]

                              Plaintiff                DECISION AND ORDER

-vs-
                                         1:19-CV-1332 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                             Defendant.

_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits.   Now before the Court is Plaintiff's motion (ECF No. 14) for judgment on the pleadings and Defendant's cross-motion (ECF No. 15) for the same relief.   For the reasons discussed below, Plaintiff's application is denied and Defendant's application is granted.

STANDARDS OF LAW

The Commissioner decides applications for SSI benefits using a five-step sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the

---

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment]. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also,*

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

*Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—
> even more so than the 'clearly erroneous' standard, and the Commissioner's
> findings of fact must be upheld unless a reasonable factfinder would have to
> conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448
> (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to
> discuss every piece of evidence submitted, and the failure to cite specific
> evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

3

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court will refer to the record only as necessary to address the errors alleged by Plaintiff.

### The Procedural History Leading Up to the Administrative Hearing

Plaintiff was previously denied benefits by the Commissioner, based on a decision by an ALJ who found, at step four of the sequential evaluation, that Plaintiff was able to perform his past relevant work and was therefore not disabled.   Plaintiff maintained that this determination was erroneous since his past work did not amount to substantial gainful activity.   Plaintiff eventually commenced an action pursuant to § 405(g) in the U.S. District Court for the Western District of New York.   However, the court (Skretny, J) disagreed with Plaintiff and entered judgment for the Commissioner.   Plaintiff, though, appealed, and the United States Circuit Court of Appeals for the Second Circuit agreed that the ALJ had erred in his step-four determination, not necessarily by finding that Plaintiff could perform his past work, but in failing to explain how the ALJ had determined that such work amounted to

substantial gainful activity.   In that regard, the Circuit Court pointed out that there was conflicting evidence regarding the amount of Plaintiff's earnings which the ALJ had not discussed.   The Second Circuit's ruling concluded as follows:

> [T]he ALJ merely asserted—without any discussion—that [claimant] performed the job as a cleaner with "sufficient earnings to raise the presumption of substantial gainful activity." C.A.R. 27. The ALJ did not, for example, find (or even allude) that [claimant's] certified earnings record omitted certain income, nor did the ALJ expressly recognize the existence of (much less reconcile) the various pieces of contradictory evidence. Moreover, the ALJ did not provide a record citation to any of the pertinent evidence discussed in this appeal, which would have at least provided some indication that he had considered the contrary evidence. In short, based on our review of the certified administrative record, the ALJ simply failed to acknowledge relevant evidence or explain his implicit rejection of the conflicting evidence. *See Bowen*, 649 F.Supp. at 702 (citing *Valente*, 733 F.2d at 1045). In light of the deficiencies in the ALJ's findings and the need for a remand so that the ALJ may set forth his reasoning with greater clarity, this Court expresses no opinion at this time as to whether substantial evidence supported the ALJ's determination that [claimant's] past work as a cleaner and refurbisher of apartments constituted "substantial gainful activity." *See Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

> Additionally, assuming arguendo that [claimant's] 2007 work as a cleaner amounted to "substantial gainful activity," we also express no view at this time as to whether the ALJ adequately explained why [claimant] could return to this past work. Indeed, resolving this matter now would be premature because remand will result in further record development regarding [claimant's] prior cleaning experience and, if the ALJ determines on remand that [claimant's] 2007 cleaning work did not rise to the "substantial gainful activity" level, then the ALJ (and any reviewing court on appeal) would not even reach the issue.

> Accordingly, we VACATE the judgment of the district court and REMAND the case to the district court with instructions to remand the matter to the Commissioner for further proceedings consistent with this order.

[*James K.*] *v. Berryhill*, 703 F. App'x 35, 38–39 (2d Cir. 2017) (footnote omitted).

On April 9, 2018, the Appeals Council issued an order vacating the Commissioner's prior decision and remanding the matter to the ALJ "for further administrative proceedings consistent with the order of the court." Tr. 417.  The order concluded by stating: "In compliance with the above, the [ALJ] will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision." Tr. 417.

Meanwhile, unbeknownst to the courts or the Commissioner, in or about 2015 Plaintiff had resumed working as a machinist in a machine shop, and continued working there for the next three years.

Upon remand by the Appeals Council to a different ALJ, a new hearing was scheduled, whereupon Plaintiff notified the Commissioner that his circumstances had changed considerably since the prior ALJ's decision.  In that regard, on April 12, 2019, Plaintiff's attorney sent a letter to the ALJ stating in pertinent part:

> Due to the passage of time, some changes occurred over the course of [claimant's] case.  Due to an experience of improvement with his psychiatric symptoms and treatment, [claimant] was able to return to work for almost three years.  While he will testify he did have some work considerations and accommodations which also assisted his success, he was able to maintain work for some time.
>
> Unfortunately, he began having health issues and an increase [in] frequency in his psychiatric symptoms.  He was unable to maintain his employment as of April 2018 and continues to remain out of work and focused on treatment.  After discussing his case, [claimant] has indicated he would like to focus on a period of disability from April 2018 to present.  He would like consideration for ongoing disability benefits rather than pursue any past possible closed period of benefits.

> At the hearing we anticipate making a formal amendment on the record for consideration of disability from April 1, 2018.

Tr. 528.

At the hearing subsequently held on October 16, 2019, Plaintiff's counsel did in fact move to amend the alleged disability onset date to April 1, 2018, which was ten years later than the original alleged disability onset date. Tr. 328.[3]   In that regard, counsel reiterated that "health changes" had occurred and that Plaintiff now wished to "refocus the period at issue." Tr. 328.   Counsel added that subsequent to the last ALJ decision, Plaintiff "had a good three-year period where he had improvement previously [sic] and then unfortunately things changed." Tr. 328.   After some further discussion about the fact that Plaintiff was actually still working even after April 1, 2018, Plaintiff and the ALJ agreed to amend the alleged onset date to April 17, 2018. Tr. 330.   Additionally, Plaintiff's counsel submitted additional medical treatment records concerning the new period, which was received in evidence, and agreed the medical record was complete. Tr. 332.   Moreover, the ALJ observed, without objection, that because of the change in circumstances, the issue raised in Plaintiff's appeal to the Second Circuit was no longer relevant, and that they would essentially be starting fresh with a new hearing. Tr. 339 ("ALJ: I don't think we're in any position to rely on anything that was concluded there," referring to the appeal).

---

[3] Plaintiff had previously alleged that he became disabled on June 1, 2008. Tr. 307.

7

As will be discussed in more detail below, on May 28, 2019, the ALJ issued a decision denying Plaintiff's application.   Consequently, the relevant period of alleged disability under consideration in in this action is the approximately-one-year period between April 17, 2018 and May 28, 2019. Tr. 304-323.

The Evidence Before the ALJ

The following is a brief summary of the medical evidence, beginning at around the time Plaintiff returned to work in 2015 and continuing through the date of the ALJ's decision.

*Evidence from Chautauqua County Department of Mental Hygiene*

On March 19, 2015, Plaintiff presented at Chautauqua County Department of Mental Hygiene ("Chautauqua"), seeking to re-establish mental health treatment for "extreme anxiety," "impulses" and "depression." Tr. 719.   Notes from the intake evaluation provide a very detailed summary of Plaintiff's mental health problems and treatment leading up to that date. Tr. 719-722.   For example, the notes indicate the following about Plaintiff: He was abused as a child and also has engaged in self-harming behaviors; he is a shy person and has always had some degree of social phobia; since childhood he has felt he needs little or no sleep to function; he has experienced racing thoughts and had difficulty concentrating at times; he previously treated at Chautauqua between 2011 and 2013, and was diagnosed with bipolar disorder after a manic reaction to mirtazapine, in which he had extreme anger; he was prescribed medications that controlled his mood very well, but with gastrointestinal side effects, and he stopped taking them for approximately two years; after he stopped taking his medication he developed symptoms of mania, depression and irritability; he has a history of feeling anger and rage; he has experienced auditory hallucinations in the past

8

when he was sleep deprived;[4] and he has had suicidal ideation but has also indicated that he would not actually commit suicide.

When Plaintiff returned to Chautauqua in 2015, he felt that he was sinking back into depression and wanted to resume treatment to address this, hopefully with medication that had fewer side effects.   Upon examination, Vivian Gerard, NP ("Gerard"), reported that her mental findings were largely unremarkable except for anxiety, mildly constricted affect, and some suicidal ideation without plan or intent. Tr.722.   Gerard noted that Plaintiff had intact memory, good attention and concentration, fair-to-good insight and impulse control and fair judgment, with no hallucinations, delusions or preoccupying thoughts. Tr. 722.   Gerard stated that Plaintiff appeared to have very good relationships with both of his parents. Tr. 722.   Gerard prescribed Seroquel, along with therapy, and emphasized to Plaintiff the importance of his being compliant in taking the medication. Tr. 723.   On September 3, 2017, Plaintiff reported that he had had some anxiety but was otherwise doing "really well" on Zyprexa, without any negative side effects. Tr. 787.   A mental status exam performed that day was essentially normal, and Plaintiff reported feeling "fine." Tr. 788.   Gerard indicated that Plaintiff was stable. Tr. 788.

On May 2, 2017, Gerard reported similar findings as before, and Plaintiff indicated that he was happy and in a new relationship, and that his anxiety was "pretty much non-existent at this time." Tr. 790.   Plaintiff added that work had been going very well, and that while some employees had been placed on a reduced schedule, he had been kept on full-time due to his work ethic. Tr. 790.   Plaintiff also denied any substance abuse at that time.

---

[4] Tr. 721 ("[H]e hears voices when he is totally sleep deprived.").

Tr. 790.   Two days later, at pharmacology monitoring visit, Plaintiff similarly reported that he had been very well lately, with no depression of hallucinations, and that he was doing well at work. Tr. 791.   On November 7, 2017, Plaintiff again reported "doing well," with no depression, fair sleep and good energy level. Tr. 796.   A mental examination performed that day yielded normal results. Tr. 797.   Gerard noted that Plaintiff seemed to be doing "just fine" at that time. Tr. 797.   At a subsequent appointment on January 9, 2018, Plaintiff similarly reported doing well. Tr. 800.

Plaintiff's next appointment at Chautauqua was on June 29, 2018, at which time he announced that he had quit his job approximately three months earlier. Tr. 801.   Plaintiff reported that he had quit his job due to "stress," and that he had "ulcers." Tr. 801.   Plaintiff admitted that prior to that, he had stopped taking his medication. Tr. 802.   Nevertheless, at the office visit, it was noted that Plaintiff seemed "happy and engaged" and in a "chipper mood," and his mental status examination yielded normal results. Tr. 803.   On August 31, 2018, Plaintiff returned to Chautauqua, and his mental status exam was normal. On December 5, 2018, Plaintiff sought treatment at Chautauqua's medical offices for a toenail injury, and reported that he was stable on the medications that he took for anxiety and depression. Tr. 851.   On January 16, 2019, during an annual physical, Plaintiff stated that he felt he would be better off dead, but also that he had no thoughts or plans of harming himself. Tr. 858.   Otherwise, Plaintiff denied any psychiatric symptoms at that time. Tr. 858. The examiner reported that Plaintiff had a normal affect, as well as intact memory, attention and concentration. Tr. 860.

On March 2, 2019, Plaintiff went to the Chautauqua emergency room complaining of a sore throat, at which time he did not report any psychiatric symptoms, and stated that he otherwise felt well. Tr. 864, 919.   On March 6, 2019, Plaintiff sought treatment for a gastrointestinal problem, at which time he denied having any anxiety. Tr. 880.

*Evidence from The Resource Center's Gateway PROS/ Counseling and Psychiatric Services*

Beginning on March 15, 2016, in addition to treating at Chautauqua, Plaintiff began attending "The Resource Center's Gateway PROS/ Counseling and Psychiatric Services" ("Gateway PROS") where he met regularly with a therapist and an employment counselor. The initial stated purposes of the treatment were to learn coping skills and reduce anxiety. Tr. 612.   On April 6, 2016, Plaintiff reported being in a good mood and denied any depression. Tr. 647.   On September 21, 2016, Plaintiff reported that his work was going well and that his bosses appreciated his work. Tr. 612.   Plaintiff stated that he used breathing techniques when he became anxious. Tr. 612.   The therapist noted that Plaintiff had a stable mood and affect and no suicidal ideation. Tr. 612.

On October 5, 2016, Plaintiff told his therapist that he felt sad since it had been the anniversary of a friend's death, but that he had coped with it by talking to people. Tr. 613. Plaintiff noted that he had felt worse when he was not working. Tr. 613.   On October 30, 2016, Plaintiff stated that he felt "groggy" but well otherwise, and that his anxiety was better. Tr. 617.   On November 2, 2016, Plaintiff reported that he had been exercising more and having no anxiety issues during the previous two weeks, but some mild depression. Tr. 615. The therapist noted that Plaintiff was "pleasant and engaging." Tr. 615.   On November 16, 2016, Plaintiff reported that he had felt manic at work one day, because he had not taken

11

his medication, but that he had gone home to get his medication. Tr. 616.   Plaintiff stated that he had not missed any work due to anxiety. Tr. 616.   Plaintiff reported being in a good mood. Tr. 616.

On December 28, 2016, Plaintiff reported that he had met his employment attendance goals and had not taken any time off. Tr. 619.   Plaintiff stated that he felt anxious, possibly due to not smoking, and lethargic, possibly due to a vitamin B12 deficiency, and that he was scheduled to receive a B12 shot the next day. Tr. 619.   The therapist noted that Plaintiff's affect was appropriate and that he was pleasant and engaging. Tr. 619.   On January 19, 2017, Plaintiff reported that he had missed two days of work due to anxiety. Tr. 620.   On January 26, 2017, Plaintiff reported feeling just a little anxious, but noted that he "had been doing well even with [his] anxiety at work." Tr. 621.   The therapist noted that Plaintiff seemed happy. Tr. 621.

At subsequent visits Plaintiff reiterated that work was going well, that activities such as fishing and golfing helped him cope with flare-ups of anxiety, and that he was attempting to quit smoking since his girlfriend did not like cigarettes. *See, e.g.*, Tr. 623. Much of the discussion in the treatment notes concerned Plaintiff's cigarette habit and his efforts to quit. *See, e.g.*, Tr. 631, 632.

On September 26, 2017, Plaintiff reported that he had been having only insignificant amounts of anxiety. Tr. 635.   On November 2, 2017, Plaintiff reported being a good mood but noted that he had been having some increased anxiety lately. Tr. 637.   On December 21, 2017, Plaintiff reported that he felt anxious about three times per week. Tr. 641.   The therapist noted that Plaintiff appeared in a good mood and was "very upbeat." Tr. 641. Plaintiff reported ongoing "stomach" issues that he attributed to anxiety. Tr. 641.

12

On January 31, 2018, Plaintiff reported that suicide was "always in the back of his mind" but that he was able to distract himself from it. Tr. 649.   Plaintiff indicated that work was going well and this "boss loves him." Tr. 649.   Plaintiff stated that he had been "very active" going to social events with a new girlfriend. Tr. 649. On February 21, 2018, Plaintiff indicated that he was having trouble sleeping, which he attributed to the fact that his symptoms typically seemed worse to him at that time of the year. Tr. 653.   On April 12, 2018, Plaintiff reported that he had bitten himself the prior week, and that he regularly struggled with feelings of self-hatred. Tr. 659.

On April 24, 2018, Plaintiff reported that he was no longer employed, but did not explain why, nor, apparently, did the therapist explore that issue.   Plaintiff said that he felt "pretty depressed" but had no suicidal ideation. Tr. 661.   On May 22, 2018, Plaintiff reported increased anxiety over the past week, which he attributed to lack of sleep. Tr. 665.

On August 23, 2018, Plaintiff reported a significantly depressed mood and difficulty sleeping. Tr. 774.   On September 24, 2018, Plaintiff reported an incident of suicidal ideation, and episodes of crying, though he denied any present suicidal ideation, and his mental status exam was unremarkable. Tr. 810-811.   On October 22, 2018, Plaintiff reported having "high anxiety" and being worried about "medical stuff." Tr. 813.   Plaintiff reported a "few depressive moments," and denied hearing voices. Tr. 813.   A mental status exam performed that day was normal. Tr. 814.

On November 5, 2018, Plaintiff reported sleeping longer after taking Prozac, having a "couple of depressive moments," and having flashbacks to his childhood. Tr. 817.   On November 19, 2018, Plaintiff reported that he had been hunting with his father and brother-in-law, which he enjoyed, and that otherwise he two instances of increased anxiety. 821.

On December 3, 2018, Plaintiff reported that he was doing alright, with better sleep and mood. Tr. 825.

Plaintiff continued seeing the staff at Gateway PROS into 2019, though the treatment notes from those visits were unremarkable, and showed Plaintiff focusing primarily on strategies for getting better sleep.

On May 9, 2019, Plaintiff's therapist and employment specialist at Gateway PROS, Amanda Hales, LMSW ("Hales") and Paul Hurley ("Hurley"), respectively, drafted a joint "to whom it may concern" letter purporting to express their "treatment team's professional opinion" about Plaintiff's ability to work.   In pertinent part, the letter stated:

> It is our treatment team's professional opinion that [Plaintiff] has previously, and would more than likely continue to experience symptoms related to his Schizoaffective Disorder, and at this time, his symptoms are impeding his ability to maintain gainful employment; especially in a competitive employment environment.   While [he] has worked with this program, he did demonstrate difficulty managing his symptoms, and maintaining his part-time employment responsibilities at Allied Industries.
>
> At Allied Industries, he was not only receiving reasonable accommodations based on his medical needs, but accommodations above and beyond [what] a typical employer can provide based on functional limitations under the AbilityOne (AbilityOne.gov) program.   At this time [he] continues working with his medical providers at improving his entire health, both mental and physical. His engagement in treatment remains consistent.

Tr. 944.

Regarding this statement, the Court pauses to note that the machine shop at which Plaintiff worked between 2015 and 2018, as noted by Hales and Hurley, was operated by Allied Industries ("Allied"), which is part of the Chautauqua County Chapter of NYSARC, an organization serving people with developmental disabilities. *See*, Tr. 506.   However, there

14

is no dispute in this action that Plaintiff's work at Allied was substantial gainful employment. At Allied, Plaintiff used machines to cut material and sew nylon pouches for the military. Tr. 341.   Prior to working at Allied, Plaintiff had worked as a welder at a metal shop not affiliated with Allied or NYSARC, and as a cleaner and renovator of apartment buildings. Tr. 340.

*Evidence from Treating Medical Doctors*

On June 21, 2018, Plaintiff visited his primary care doctor and denied having any psychiatric symptoms. Tr. 749.   Plaintiff told his doctor that he had started vomiting blood in April 2018, two months earlier, but that he had not sought treatment and the problem had resolved after he quit his job. Tr. 749.   Plaintiff did not mention having any increase in mental health symptoms around the time he stopped working.   Plaintiff acknowledged being a current illegal drug user and a heavy consumer of cigarettes and coffee. Tr. 750. Plaintiff stated that he enjoyed exercising. Tr. 750.   The doctor noted that Plaintiff appeared well and was in a cheerful mood. Tr. 750.

*Evidence from the Consultative Psychologist*

On August 29, 2018, Susan Santarpia, Ph.D. ("Santarpia") conducted a psychiatric evaluation at the Commissioner's request.   Plaintiff told Santarpia that his mental health diagnosis was bipolar I disorder. Tr. 776.   Santarpia noted, from reviewing Plaintiff's records, that he also had diagnoses of post-traumatic stress disorder ("PTSD") and panic disorder with agoraphobia.   Regarding his current functioning, Plaintiff told Santarpia that he awakened frequently while sleeping; that his current medication controlled his depression well, and that depression was less of a problem for him than anxiety; that he had no suicidal ideation; that he had excessive apprehension, worry and restlessness; that he smoked marijuana regularly; and that he believed his medication interfered with his ability to

15

concentrate. Tr. 777. Plaintiff indicated that he was able to care for his own needs and drive a car, that he had good relationships with family and friends, and that he spent his days hunting and fishing. Tr. 779.   Upon examining Plaintiff, Santarpia reported normal findings, including full affect, euthymic mood, intact attention and concentration, intact memory, average cognitive functioning, fair insight and judgment. Tr. 779.   Santarpia's medical source statement indicated that Plaintiff was able to perform the mental demands of work, and noted only the following limitation: "Mild impairment is demonstrated in regulating emotions, controlling behavior, and maintaining well-being.   Difficulty is caused by substance use and lack of medication that was once stabilizing."[5] Tr. 779.

In addition to her narrative report, Santarpia completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental)." Tr. 781-783.   On this form, Santarpia indicated that Plaintiff's ability to understand, remember and carry out instructions was not affected by his impairments, and that he had no limitations in any of the specific functions in this category. Tr. 781.   Santarpia further indicated that Plaintiff had no limitations in interacting with supervisors, co-workers or other people, or responding to changes in the work environment. Tr. 782.   Santaria also stated that Plaintiff's ability to concentrate, persist, maintain pace, adapt or manage himself was unaffected. Tr. 782.

*Plaintiff's Hearing Testimony*

Plaintiff testified that he quit his job in April 2018 because he was having stomach problems (vomiting) that he attributed to anxiety. Tr. 342.   Plaintiff stated that he was later diagnosed with esophagitis due to acid reflux. Tr. 342.   Plaintiff offered that he had missed

---

[5]  Santarpia was referring here to Klonopin, which Plaintiff indicated had been effective in controlling his symptoms. Tr. 777.

some work due to this problem, and thought that he might have gotten fired in any event, Tr. 344-345, though there is nothing else in the record indicating that he was in danger of losing his job before he quit; nor did Hales or Hurley suggest that Plaintiff was in danger of being fired.   When asked to explain what had happened during the period leading up to him quitting his job, Plaintiff stated that he had been drinking heavily during his first two years at Allied, and that after he quit drinking in 2017, his "stress levels were a lot higher." Tr. 344. Although, this claim of alcohol abuse during that period is also unsupported by the treatment records.   Plaintiff also stated that he had failed a drug test. Tr. 345.   Again, though, it is undisputed that Plaintiff was not fired.   Plaintiff told the ALJ that he had talked with his job coach, presumably meaning Hurley, about the situation before deciding to quit the job, Tr. 360, but, again, there is no record of such a discussion.

Plaintiff testified that he had not worked since April 2018, and that he was no longer in a program with Gateway PROS, though he did talk with Hurley occasionally about finding a new job. Tr. 346.   In that regard, Plaintiff stated that he was interested in finding a welding job, working up to ten hours per week, but no more than that, because when he was working thirty hours per week he had problems with attendance due to anxiety. Tr. 346.   Plaintiff stated that he felt he needed to better address his anxiety before returning to work, though he did not indicate that he was actually doing anything new or particular to achieve that goal, except for occasionally attending classes and "getting into the mindfulness meditations." Tr. 359-360.

Plaintiff testified that approximately three days per month he does not have the energy to get out of bed, and that some days he spends the entire day in bed, only getting up to use the bathroom. Tr. 350, 363.   Plaintiff added that he has daily auditory

17

hallucinations "throughout the day." Tr. 350, 364.   Plaintiff also stated that he is unable to get out of bed some days due to side effects from his medications. Tr. 355.   Plaintiff stated that he does not usually rise from bed until mid-afternoon, and that he then spends time mostly playing video games (up to seven hours at a time), reading occasionally and visiting weekly with friends with whom he sometimes smokes marijuana. Tr. 355–356, 358.

The ALJ's Decision

On May 28, 2019, the ALJ issued a decision and order denying Plaintiff's application and finding that he was not disabled at any time between April 17, 2018 and the date of the decision. Tr. 304-323.   The decision recited the entire administrative history of the action, including the remand from the Second Circuit, and the directions contained in the Second Circuit's decision. Tr. 307.   However, the ALJ noted how Plaintiff had subsequently abandoned the prior claim period and moved to amend his claim to allege disability onset as of April 17, 2018. Tr. 307.   The ALJ further noted how Plaintiff's last-insured dated for SSDI benefits had expired prior to April 17, 2018, and dismissed the claim for such benefits. The ALJ indicated, therefore, that his decision would solely concern Plaintiff's application for SSI benefits. Tr. 308.   Then, applying the sequential evaluation to the evidence concerning the new alleged period of disability, the ALJ found at step two that Plaintiff did not have a severe impairment and was therefore not disabled.

Regarding the step two analysis, the ALJ found that Plaintiff had medically determinable impairments consisting of bipolar disorder, schizoaffective disorder, generalized anxiety disorder with panic attacks, cannabis dependence, current, cocaine

dependence[6] and abuse in sustained remission, functional dyspepsia and esophagitis. Tr. 310.   The ALJ found, though, that those impairments, either singly or in combination, did not, and were not expected, to significantly limit Plaintiff's ability to perform basic work-related activities for twelve consecutive months, and that Plaintiff therefore had no severe impairments. Tr. 310.   The ALJ spent several pages reviewing the applicable legal standards, medical treatment evidence, medical opinion evidence and other evidence concerning Plaintiff's activities, and explaining why he did not find any of Plaintiff's impairments to be severe.   The ALJ noted, for example, that while some of the older medical evidence of record, which he discussed to provide a longitudinal perspective, indicated that Plaintiff had significant functional impairments, that the evidence since April 2018, including the opinion of Dr. Santarpia, which he gave significant weight, showed "only mild limitations." Tr. 314.   The ALJ also considered Plaintiff's mental impairments under the "paragraph B" criteria, finding that he had at most mild impairments, and that the impairments were therefore non-severe under 20 C.F.R. § 416.920a(d)(1). Tr. 316-317.

The ALJ noted that some medical opinion evidence from years before the relevant period had indicated that Plaintiff's mental impairments caused moderate, marked and even extreme limitations in various aspects of functioning. *See, e.g.*, Tr. 253–254.   The ALJ also discussed how the May 2019 letter from Hales and Hurley had indicated that Plaintiff was unable to work due to his schizoaffective disorder. Tr. 315.   The ALJ found, however, that the opinion letter from Hales and Hurley was worthy of only little weight since it was conclusory and unsupported by the authors' own notes or by "the remainder of the

---

[6] In 2015, for example, Plaintiff admitted to an emergency room doctor that he abused marijuana and cocaine. Tr. 700.

evidence," unlike Dr. Santarpia's opinion. Tr. 315.

Plaintiff appealed, but the Appeals Council declined to review the ALJ's determination, making the ALJ's decision the Commissioner's final decision. Tr. 398.

### The Alleged Errors by the ALJ

In this action, Plaintiff contends that the ALJ committed error by finding that his impairments were non-severe and by failing to follow the remand instructions from the Second Circuit.   These arguments will be discussed in more detail below.

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence

The Court has carefully reviewed and considered the parties' submissions and finds, for the reasons discussed below, that Plaintiff's arguments lack merit and that the Commissioner's decision should be affirmed.

DISCUSSION

### The ALJ Did Not Disregard the Second Circuit's Instructions

As just mentioned, Plaintiff makes a secondary argument that the ALJ erred in denying the claim at step two of the sequential evaluation, since the Second Circuit had remanded the matter with instructions concerning how the ALJ was to proceed at step four. However, the argument is indisputably baseless insofar as it ignores the procedural history set forth above, including the fact that Plaintiff had resumed working for three years during the interim between the first and second ALJ decisions, and the fact that Plaintiff had expressly abandoned the claim period that was the subject of the Second Circuit's decision.[7]

---

[7] The reader will recall that the issue upon which the appeal turned was whether Plaintiff's work in 2007 amounted to substantial gainful activity.

Defendant's application is therefore denied to the extent it is based on this frivolous argument.

The ALJ's Step-Two Finding

Plaintiff's primary argument is that the ALJ erred at step two of the sequential evaluation by finding that none of his impairments was severe, because he failed to apply the "*de minimis* standard."

"[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (*citing Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir.1995)); *see also, Parker-Grose v. Astrue*, 462 F. App'x 16, 17 (2d Cir. 2012) ("To be 'disabled' within the meaning of the Social Security Act, a claimant must have an impairment or combination of impairments that are 'severe.'   An impairment is severe if it significantly limits the claimant's ability to do basic work activities. The 'severity regulation,' however, is valid only if applied to screen out *de minimis* claims.") (citations and internal quotation marks omitted).

As Plaintiff acknowledges in his brief, "[a]n impairment is 'not severe' if the medical evidence establishes only a slight abnormality or combination of slight abnormalities which do not significantly limit an individual's ability to perform basic work-related activities." Pl. Memo of Law at p. 19 (citing *Logan v. Astrue*, 2008 WL 4145515, *6 (S.D.N.Y. Sept. 8, 2008) and SSR 85-28).

Perhaps most significantly, for purposes of the instant action, to be found severe at step two, an impairment must meet the severity requirements during the relevant period of alleged disability, which, in this case, runs from April 17, 2018 to May 28, 2019. *See, e.g., Guerra v. Colvin*, 618 F. App'x 23, 24 (2d Cir. 2015) ("Guerra did not establish that any of

these conditions was a severe impairment *during the relevant period*.") (emphasis added); *see also, Brogan-Dawley v. Astrue*, 484 F. App'x 632, 633 (2d Cir. 2012) ("The evidence showed that Brogan–Dawley's impairments predated or postdated *the relevant period* or did not 'significantly limit her physical or mental ability to do basic work activities.'") (quoting *Jasinski v. Barnhart*, 341 F.3d 182, 183 (2d Cir.2003); emphasis added).

The fact that a claimant's impairment may have been severe at some earlier time outside of the relevant period of alleged disability does not control, particularly where, as here, the claimant engaged in substantial gainful activity in the interim. *See*, *Reynolds v. Colvin*, 570 F. App'x 45, 47 (2d Cir. 2014) ("[T]he 1989 cervical spine MRI and June 3, 1991 office note were generated more than a decade prior to the relevant period. Moreover, it is undisputed that in the interim, claimant worked at substantial gainful activity, a circumstance making it difficult to infer severe impairment from the earlier records.").

Here, in arguing that the ALJ misapplied the "*de minimis* standard," Plaintiff focuses on his mental, not physical, impairments, and states:

> In the present case, there is sufficient evidence in the record to establish the severity of Plaintiff's mental health impairments, including but not limited to reports of daily auditory hallucinations and continued suicidal ideations and thoughts of being "better off dead." (Tr. 350, 810, 858). Additionally, the evidence of record contains multiple formal diagnoses of mental illness by a variety of mental health professionals in varied settings, including, bipolar disorder, schizoaffective disorder, and generalized anxiety disorder with panic attacks. (Tr. 779, 812, 858,).
>
> The above-described evidence is certainly sufficient to satisfy the "low hurdle" of a *de minimis* standard. Notably, at Step 2, "it is not [even] necessary to find one's impairment so incapacitating as to require hospitalization before it qualifies as a severe impairment." *Oakley v. Colvin*, No. 3:13-CV-679 GLS/ESH, 2015 WL 1097388, at *6 (N.D.N.Y. Mar. 11, 2015). Yet, as set forth above, Plaintiff's mental health [problems] have previously required a 9-day in-

patient hospitalization, (Tr. 172), and have continued to persist over the years despite treatment with counseling and psychotropic medication. (Tr. 809-812). A "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y. March 19, 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n.12, 107 S.Ct. 2287 (1987)). The administrative record provides clear evidence that Plaintiff's mental health conditions have more than a minimal effect on his activities of daily living and ability to sustain substantial gainful employment. Indeed, Plaintiff's Treating Clinicians opined that, because of his mental health symptoms, Plaintiff required many accommodations and what essentially amounted to a sheltered work environment in order to sustain substantial gainful activity. (Tr. 944). At his hearing, Plaintiff testified that he received supportive employment series including a job coach who advocated for him if he "had any issues and any time that…[he] was unable to come in to work." (Tr. 343). Also, at the hearing, the vocational expert testified that the requirement of such accommodations would preclude employment in all jobs identified in his vocational expert testimony. (Tr. 377-378). Given the medical evidence of record combined with the opinions of Plaintiff's treating sources, it was error for the ALJ to find that Plaintiff's mental conditions did not satisfy the *de minimis* standard and satisfy the threshold of severity.

Pl.'s Mem. of Law at pp. 19-20.

However, Plaintiff has not shown that the ALJ failed to apply the *de minimis* standard, or that he applied that standard incorrectly. The ALJ's decision expressly discusses the appropriate standard and indicates that he applied it. Tr. 309, 310-317.  Plaintiff has not shown that the ALJ failed to follow any particular statute or regulation concerning the severity determination or the evaluation of evidence.

What Plaintiff is really arguing here is that the Court should re-weigh the evidence, since there was evidence from which the ALJ *could have found* that Plaintiff's impairment was severe.   In that regard, Plaintiff seemingly almost contends that since there was such

evidence, the ALJ was required to make a finding of severity at step two.   However, the ALJ was not required to credit that evidence, and his decision not to do so here is supported by substantial evidence, as can be seen from the Court's discussion of the evidence above.

For example, Santarpia found that Plaintiff had no limitations to working, and her opinion is consistent with the other evidence during the relevant period.   Throughout that period, Plaintiff reported few if any symptoms or side effects, mental status examinations were typically normal, and his symptoms appeared well-controlled with medication and breathing techniques.   On the other hand, the narrative put forward by Plaintiff, that he stopped working in April 2018 because his mental and physical health spiraled downward, and remained there, is not supported by the treatment records, and especially not by the records from Gateway PROS.   Rather, as discussed above, the treatment record shows that shortly before Plaintiff abruptly stopped working, he was consistently indicating that he felt well, and that work was going well.[8] At most, the treatment records indicate that at the time Plaintiff quit his job he was having a flare up of esophagitis due to acid reflux, that was causing him to vomit.   Also, notably absent from those same records is *any* mention of current auditory hallucinations, though at the administrative hearing Plaintiff claimed to have them every day, even while he was still working.[9]   Similarly, contrary to Plaintiff's testimony at the hearing, the treatment record gives no indication that Plaintiff's medications gave him side effects that caused him to be unable to get out bed.   Plaintiff's hearing testimony that his anxiety spiked in early 2018 because he had stopped drinking alcohol excessively is also

---

[8] At most, the treatment records indicate that at the time Plaintiff quit his job he was having a flare up of esophagitis due to acid reflux, that was causing him to vomit.

[9] As already mentioned, treatment records indicate that Plaintiff consistently told doctors that he had auditory hallucinations only occasionally, when he was especially sleep deprived.

not supported by the treatment record.   The ALJ specifically referenced most of these discrepancies when explaining his step-two finding.

In sum, the Court finds that Plaintiff has not shown that the ALJ committed reversible legal error or that the ALJ's decision is unsupported by substantial evidence.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 14) for judgment on the pleadings is denied, Defendant's cross-motion (ECF No. 15) for the same relief is granted, and this matter is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and to close this action.

So Ordered.

Dated: Rochester, New York
        March 29, 2021

                                    ENTER:


                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge

25